**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA,**<br><br>**v.**<br><br>**JOLY GERMINE and ELIANDE TUNIS,**<br><br>**Defendants.** | **Criminal Action No. 21-699 (JDB)** |

**MEMORANDUM OPINION AND ORDER**

Before the Court are several pre-trial motions brought by co-defendants Joly Germine and Eliande Tunis.  Germine and Tunis face four dozen counts relating to the smuggling of firearms from the United States to Haiti to benefit a Haitian gang known as 400 Mawozo.  Defendants each filed motions to suppress statements they made to law enforcement, motions to suppress evidence of 400 Mawozo's illegal activities, and motions to sever their trials.  Defendants also seek to join and adopt each other's motions to suppress evidence about 400 Mawozo.  The government has filed a Federal Rule of Evidence 404(b) notice, seeking to introduce evidence of Germine's calls about a specific kidnapping against him.  Germine opposes the government's 404(b) notice and the government opposes all of defendants' motions.  For the reasons explained below, the Court will deny defendants' motions and will permit the government to introduce certain 404(b) evidence.

**Background**

The Court will provide a brief initial overview of this matter and will then address additional facts as relevant in the analysis section.  In 2021, the Federal Bureau of Investigation ("FBI") investigated the kidnappings of U.S. citizens in Haiti by the Haitian gang 400 Mawozo.  See Second Superseding Indictment [ECF No. 73] ("SSI") at ¶¶ 1–9.  400 Mawozo would kidnap

victims at gunpoint and hold them for ransom, at times demanding up to $50,000 from the victim's family.  Id. ¶¶ 3–4.  Most notably, on October 16, 2021, 400 Mawozo kidnapped seventeen Christian missionaries—all but one U.S. citizens—this  time demanding $1,000,000 per hostage. Id. ¶¶ 5–8.  The FBI's investigation into these kidnappings led to several Haitian nationals who were suspected of being members of 400 Mawozo.  Id. ¶¶ 18–23.  As relevant here, two of the individuals were Joly Germine, who at the time was incarcerated in Haiti, and Eliande Tunis, a U.S. citizen living in Florida.  Id. ¶¶ 18, 20.  The government alleges that Germine, Tunis, and other co-conspirators knowingly and willingly conspired to export firearms and ammunition from the United States to Haiti in order to support the unlawful activities of 400 Mawozo.  Id. ¶¶ 25– 26. Tunis was arrested on October 30, 2021 and Germine was extradited to the United States on May 3, 2022.  The government has not pursued the kidnapping charges in this case.

Defendants Germine and Tunis are charged with (1) conspiring to violate the Export Control Reform Act ("ECRA") (Count 1); (2) conspiring to commit smuggling and to defraud the United States (Count 2); (3) violating the ECRA, 50 U.S.C. § 4819 (Counts 3–17); (4) smuggling, in violation of 18 U.S.C. §§ 554(a), 2 (Counts 18–20); (5) laundering of monetary instruments (promotion), in violation of 18 U.S.C. §§ 1956(a)(2)(A), 2 (Counts 21–34); and (6) laundering of monetary instruments (proceeds), in violation of 18 U.S.C. §§ 1956(a)(1)(A)(i), 2 (Counts 35–48). As part of the pre-trial proceedings, several motions sought various forms of relief.  The parties filed opposition and reply briefs, and the Court conducted an evidentiary hearing on December 21, 2023.  The motions are now ripe for decision.

## Analysis

As noted, defendants Germine and Tunis filed individual motions to suppress statements they each made to law enforcement; joint motions in limine to suppress the introduction of

evidence relating to 400 Mawozo, including the gang's kidnappings; and individual motions to sever their trials.  The government filed a notice to introduce evidence relating to a specific kidnapping under Rule 404(b).  The Court will address each of these in turn.

## I.  Motion to Suppress Germine's May 3, 2022 Interview Statements

Germine seeks to suppress statements he made to law enforcement while in FBI custody on a flight from Haiti to the United States.  On May 3, 2022, the Haitian national police transferred custody of Germine to the FBI, who escorted Germine onto a Learjet to fly to the United States.[1] Rough Hr'g Tr. (Dec. 21, 2023) at 11:9–13:4.  Shortly after takeoff, an FBI agent advised Germine of his Miranda rights in Haitian-Creole.[2]  Tr. of Interview of Joly Germine [ECF No. 92-2] ("May 3 Tr.") at 2:3–2:21.  Germine then executed a written Miranda waiver, again in Haitian Creole, by signing the FBI's "Advice of Rights" form.  FBI Advice of Rights [ECF No. 92-1] at 1.  FBI agents proceeded to interview Germine—with a special agent acting as a translator—over the duration of the flight, which lasted approximately three hours.  Rough Hr'g Tr. at 24:16–24:20.  During the interview, the agents advised Germine that he might receive less prison time if he cooperated and told them the truth.  May 3 Tr. at 20:15–20:19.

Germine contends that he "did not make a deliberate choice to waive[] his right against incrimination" and that "[h]is will was overborne and his capacity for self-determination was critically impaired" due to the agents' conduct.  Def.'s Mot. to Suppress Statements [ECF No. 81] ("Germine Mot. to Suppress") at 4–5.  Germine was undisputedly subject to a custodial interrogation while on the flight to the United States.  Rough Hr'g Tr. at 16:25–17:2.  He had just been extradited from Haiti, he spent the flight handcuffed and shackled, he was questioned about

---

[1] The Learjet was an executive jet that could fit approximately twenty-five people.

[2] Germine speaks Haitian-Creole and does not understand English.

his association with the 400 Mawozo gang, and he was repeatedly informed he might go to prison. <u>See</u> Germine Mot. to Suppress at 1; May 3 Tr. at 17:11–20:19.  But the record does not indicate that Germine's statements, which he made after waiving his <u>Miranda</u> rights, were involuntary.

To introduce a defendant's confession, the government bears the burden of proving that the statement was voluntary.  <u>United States v. Murdock</u>, 667 F.3d 1302, 1305 (D.C. Cir. 2012). Voluntariness turns on whether the defendant's "'will' was 'overborne and his capacity for self-determination critically impaired' as a result of the agents' conduct."  <u>United States v. Hallford</u>, 816 F.3d 850, 857 (D.C. Cir. 2016) (quoting <u>Schneckloth v. Bustamonte</u>, 412 U.S. 218, 225–26 (1973)).  In ruling on the admissibility of a statement, courts must consider the totality of the circumstances, including "the defendant's age and education, the length of detention, whether the defendant was advised of his rights, and the nature of the questioning."  <u>Murdock</u>, 667 F.3d at 1305–06.

As an initial matter, where, as here, a defendant is read his <u>Miranda</u> rights, and subsequently waives those rights in writing, that waiver "will usually go far toward demonstrating that a decision to speak is not compelled."  <u>United States v. Yunis</u>, 859 F.2d 953, 961 (D.C. Cir. 1988).  The other circumstances surrounding the interview here further support a finding that Germine's statements were voluntary.

Germine argues that the setting of his interview—which was conducted inflight aboard the Learjet—is itself problematic.  <u>See</u> Rough Hr'g Tr. at 169:23–174:13.  But in <u>Yunis</u>, the D.C. Circuit upheld the validity of the defendant's waiver where the seasick defendant was interrogated over the course of four days while in a small, uncomfortable room on a boat.  859 F.2d at 955, 964. In contrast, Germine was interviewed while sitting in a leather captain's chair aboard a Learjet, which, while small, offers more comfort than most interrogation rooms.  The interview itself lasted

under three hours and Germine was offered food and drink throughout the flight.  See, e.g., May 3 Tr. at 27:13–27:21.  And although the agents noticed that Germine was nervous during takeoff, an FBI agent testified that he did not appear nervous during the interview after takeoff.  Rough Hr'g Tr. at 16:12–16:19, 50:5–50:8.

Germine's argument that his unfamiliarity with the U.S. legal system prevented him from knowingly and voluntarily speaking with the agents fares no better.  The agents read Germine his rights in Haitian-Creole, and Germine gave no indication that he did not understand the substance of the warnings.  Indeed, when presented with a presentment waiver during the interview, Germine confirmed he was aware that he still had a right to a lawyer upon landing.  See May 3 Tr. at 23:7–23:16.  The evidence, accordingly, demonstrates that Germine understood the "plain meaning of the required warnings."  Yunis, 859 F.2d at 964.  Whether Germine "fully appreciate[ed] the beneficial impact" of remaining silent or "fully [understood] the tactical advantage, in our system of justice, of not speaking" is irrelevant.  Id. at 965.  A defendant's unfamiliarity with the legal system does not affect the validity of his waiver where his unfamiliarity "did not prevent him from understanding the Miranda rights as they were presented to him."  Id.

There is, in short, no factor that supports the view that Germine's statements were involuntary, considering the totality of the circumstances surrounding his custodial interview. Because the government has established the voluntariness of Germine's statements, the Court will deny Germine's motion to suppress his May 3 interview.

## II.   Motion to Suppress Tunis's October 30, 2021 Interview Statements

Tunis seeks to suppress statements she made during an October 30, 2021 interview with FBI agents.  Def. Eliande Tunis's Mot. to Suppress October 30, 2021 Statements & Req. for Hr'g [ECF No. 78] ("Tunis Suppression Mot.") at 2–3.  FBI agents first interviewed Tunis on October

25, 2021 at the Fort Lauderdale International Airport.[3]  Gov't Opp'n to Tunis Suppression Mot. [ECF No. 91] at 2.  The next day, Tunis and the FBI agents met at a Chili's restaurant near Tunis's house.  Id. at 3.  At that meeting, Tunis agreed to speak with agents from the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF"), who questioned her about ATF forms she filled out involving gun purchases.  Id.; Rough Hr'g Tr. at 107:8–107:25.  On October 28, 2021, Tunis participated in another voluntary interview with the FBI agents.  Id. at 108:1–108:12.

Tunis and the FBI agents met at Chili's one more time on October 30, 2021.  Gov't Opp'n to Tunis Suppression Mot. at 3.  At the start of their meeting, Tunis agreed to continue the interview at the FBI's Miami field office.  Id.; Rough Hr'g Tr. at 82:3–83:19.  The agents drove Tunis there with her consent and brought her to a large conference room, at which point they played three audio files for Tunis that they believed demonstrated her involvement in smuggling firearms.  Gov't Opp'n to Tunis Suppression Mot. at 3.  Tunis was then read her Miranda rights and she signed an "Advice of Rights" form indicating that she understood her rights and agreed to answer questions.  Id.; id., Ex. 1 [ECF 91-1] ("Tunis Waiver").  After forty-five minutes of questioning, Tunis wrote short notes confessing that she had purchased firearms on Germine's behalf to send to Haiti.  Gov't Opp'n to Tunis Suppression Mot. at 3; id., Ex. 2 [ECF 91-2].  A few hours later— after more questioning—an FBI agent wrote a three-page summary of Tunis's oral statements.  Gov't Opp'n to Tunis Suppression Mot. at 3.  Tunis reviewed it, made two minor corrections, and initialed and signed the statement.  Id.; id., Ex. 3 [ECF No. 91-3].  Tunis continued to answer questions until approximately 8:00 p.m.  Gov't Opp'n to Tunis Suppression Mot. at 3–4.  At the conclusion of the interview, the agents arrested Tunis.  Id. at 4.

---

[3] The agents also executed a search warrant on Tunis's phone.  Gov't Opp'n to Tunis Suppression Mot. at 2.

Tunis claims that while the statements she made during the first three interviews were voluntary, her October 30 statements were the product of improper threats and should be suppressed.[4]  Tunis Suppression Mot. at 2.  Specifically, Tunis asserts that the agents showed her pictures of her daughters and offered her a choice between a life with her daughters or a life in prison.  See Rough Hr'g Tr. at 126:3–128:24.  Because she only agreed to cooperate under the threat of separation from her children, Tunis argues that her statements were involuntary.

As with Germine's motion, the Court must consider the totality of the circumstances, which includes "the defendant's age and education, the length of detention, whether the defendant was advised of [her] rights, and the nature of the questioning."  Murdock, 667 F.3d at 1305–06.  The totality of the circumstances here demonstrates the voluntariness of Tunis's statements.

The Court first considers the timing of when Tunis was read her Miranda rights and credits the government's testimony that she was read her rights towards the beginning of her interview, at approximately 2:30 p.m.  Tunis testified that the agents did not read the Miranda warnings until approximately 6:00 p.m., Rough Hr'g Tr. at 139:8–139:22, but the advice of rights form she signed is time stamped at 2:34 p.m., with the witness signatures timestamped at 2:35 p.m.  Tunis Waiver.  The Court finds it difficult to imagine that all three signatories misread or miswrote the proper time, and hence places the timing of the Miranda warnings at the onset of the agents' questioning.

The Court next moves to Tunis's specific allegation regarding the threats of losing her children.  At the hearing, one of the agents who interviewed Tunis did not recall showing Tunis pictures of her daughters but agreed that the agents likely indicated that she was facing years in prison away from her children.  Rough Hr'g Tr. at 113:11–115:4.  The government has since confirmed that at the onset of the interview, another agent showed Tunis pictures of her daughters

---

[4] Tunis does not challenge the validity of the Miranda waiver she signed, nor does she argue she could not understand the form.  Tunis Suppression Mot. at 2; Rough Hr'g Tr. at 190:20–190:22.

and informed her that she had a choice "between cooperating to the benefit of her family or choosing to ally herself with [Germine]." Gov't Letter Correcting the R. [ECF 106-1] at 2.

Tunis relies on Lynumn v. Illinois, 372 U.S. 528 (1963), for the proposition that threats involving one's children can reach the level of coercion. Id. at 534. But merely informing a defendant of potential consequences the defendant faces, even if those consequences relate to the defendant's children or make the defendant uneasy, does not reach the level of "egregious police activity" warranting suppression: "[o]fficers may discuss consequences related to a defendant's children if a defendant is arrested, jailed, or refuses to cooperate." United States v. Harris, Crim A. No. 19-358 (RC), 2021 WL 1167263, at *2 (D.D.C. Mar. 26, 2021); see also United States v. Roberson, 573 F. Supp. 3d 209, 236 (D.D.C. 2021) ("The officers' questions, freighted though they may have been, did not constitute egregious conduct critically impairing [defendant]'s capacity for self-determination."). Unlike the officers in Lynumn, who elicited a false confession from the defendant by threatening to cut off state financial aid from her infant children and remove them from her custody if she did not cooperate, see 372 U.S. at 534, the agent here—using admittedly questionable tactics—truthfully informed Tunis that she faced a choice between cooperating with the FBI or facing years in prison away from her children.[5]

The Court finds, after considering the totality of the circumstances, that Tunis made her statements voluntarily. In the week leading up to the October 30 interview, Tunis voluntarily cooperated with the FBI three separate times. By October 30, she was familiar with both the agents and the types of questions they asked. Despite Tunis's assertion that the topic abruptly shifted on

---

[5] Other circumstances present in Lynumn are not present here. In Lynumn, the defendant was cornered by three officers and a convicted felon in her home, had not been read her Miranda rights, and had no reason to doubt the officers' threats. 372 U.S. at 534. Tunis, in contrast, was familiar with the agents and the topics at issue, voluntarily met with the agents on three previous occasions, and was read her Miranda rights. Gov't Opp'n to Tunis Suppression Mot. at 7. She also sat in a large conference room, received several breaks, and was offered food and water throughout the interview. Id. at 6.

October 30 from kidnappings to firearms, she had been questioned by ATF agents about forms relating to the firearms earlier that week.  See Rough Hr'g Tr. at 107:8–107:25.  And her statements themselves are indicative of voluntariness: Tunis not only handwrote her own statement, but she corrected errors in the agent's summary of her statements and initialed each page.  See United States v. Cooper, 85 F. Supp. 2d 1, 29 (D.D.C. 2000) ("The Court also finds highly persuasive the fact that [defendant] wrote most of his own statements."); United States v. Bethancourt, 65 F.3d 1074, 1078–79 (3d Cir. 1995) (finding voluntariness where the evidence showed that "the [defendant] actively participated in the drafting and correction of his confession," and "initialed every paragraph and signed each  page of the confession").

Given Tunis's consistent voluntary cooperation with the FBI, her familiarity with the agents and their questions, her signed Miranda waiver, the written statements she drafted or signed, and her fluency in English, the Court is convinced that she made her October 30 statements voluntarily.  Hence, her motion to suppress those statements will be denied.

### III.   Motions to Suppress 400 Mawozo Evidence

Both defendants move the Court to suppress evidence of (1) their association with 400 Mawozo and (2) evidence of 400 Mawozo's kidnappings.  Germine also asks the Court to deny the government's Rule 404(b) request and to suppress evidence relating to the kidnapping of U.S. citizen C.G.

The government argues that evidence of 400 Mawozo's activities, including the 2021 kidnappings, is intrinsic to the charged offenses and that the Court should admit this evidence without conducting a 404(b) analysis.  Gov't Omnibus Opp'n to Defs.' Mots. in Lim. to Exclude Certain Evid. [ECF No. 90] ("Gov't Opp'n to MIL") at 7–8.  Alternatively, the government posits that the evidence of general gang association or of the 2021 kidnappings is admissible under Rule

404(b)(2).  Id. at 8.  The government does not argue that evidence of Germine's calls concerning C.G.'s kidnapping is admissible as intrinsic evidence but seeks to bring it in under Rule 404(b)(2). See generally Gov't Mot. & Notice Regarding Fed. R. Evid. 404(b) as to Def. Germine [ECF No. 76] ("404(b) Notice").

Federal Rule of Evidence 404(b) prohibits the introduction of "[e]vidence of any other crime, wrong, or act . . . to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character."  Fed. R. Evid. 404(b)(1).  Rule 404(b)'s limitations do not apply, however, to "intrinsic" acts – those that are "'part of the charged offense,' or of 'uncharged acts performed contemporaneously with the charged crime . . .  if they facilitate the commission of the charged crime.'"  United States v. McGill, 815 F.3d 846, 879 (D.C. Cir. 2016) (per curium) (omission in original) (quoting United States v. Bowie, 232 F.3d 923, 929 (D.C. Cir. 2000)).  Said otherwise, if an act is intrinsic to the charged offense, the Court need not consider whether evidence of that act is admissible under Rule 404(b).

Intrinsic evidence includes evidence "offered as direct evidence of a fact in issue, not as circumstantial evidence requiring an inference regarding the character of the accused."  United States v. Alexander, 331 F.3d 116, 126 (D.C. Cir. 2003).  And where the indictment contains a conspiracy count, evidence of an incident that is part of the alleged conspiracy is admissible as intrinsic evidence of the conspiracy.  United States v. Hemphill, 514 F.3d 1350, 1357 (D.C. Cir. 2008).  But the boundaries of an intrinsic act are not limitless, and the D.C. Circuit has explicitly "rejected the rule embraced by some [other] circuits that evidence is intrinsic if it 'complete[s] the story' of the charged crime."  McGill, 815 F.3d at 879 (second alteration in original) (quoting Bowie, 232 F.3d at 928).

Evidence that "completes the story," while not admissible as intrinsic evidence, may still be admissible under Rule 404(b)(2).  Rule 404(b)(2) permits the introduction of extrinsic, or "other," acts for the purpose of proving motive, opportunity, intent, plan, or knowledge.  Fed. R. Evid. 404(b)(2).  In conspiracy prosecutions, the government "is usually allowed considerable leeway in offering evidence of other offenses 'to inform the jury of the background of the conspiracy charged, to complete the story of the crimes charged, and to help explain to the jury how the illegal relationship between the participants in the crime developed.'"  United States v. Mathis, 216 F.3d 18, 26 (D.C. Cir. 2000) (quoting United States v. Williams, 205 F.3d 23, 33–34 (2d Cir. 2000)).  Courts also permit evidence of "other acts" to show "the nature of a conspiracy and the kind of organizational control a defendant exercised," or "the defendants' intent to act in concert."  McGill, 815 F.3d at 879 (internal quotation marks omitted).

Evidence that is otherwise admissible—either as an intrinsic act or under Rule 404(b)(2)—may  still be barred if the Court finds that "its probative value is substantially outweighed by a danger of . . . unfair prejudice."  Fed. R. Evid. 403.

### A.  Evidence of Gang Association

The government argues that evidence of the defendants' gang association is intrinsic to the conspiracy charges and to the money laundering charges relating to proceeds.  Gov't Opp'n to MIL at 7–8.  Defendants admit that the government has evidence tying the shipment of firearms to a gang in Haiti but argue that the gang's involvement is not a necessary component of the charged offenses, thereby making such evidence extrinsic rather than intrinsic.  See Rough Hr'g Tr. at 219:4–221:4.  They further argue that the evidence should be excluded under Rule 403.  Id. at 221:6–221:13.

The Court agrees with the government that the counts in the second superseding indictment, which include conspiracy to smuggle firearms for the purpose of benefitting and supplying 400 Mawozo (Counts 1 and 2), require some examination of the defendants' association with 400 Mawozo.  And particularly as to the money laundering (proceeds) counts, the government must prove that the defendants knowingly facilitated transactions in interstate commerce with proceeds from illegal activities (Counts 35–48).  Evidence of the defendants' association with 400 Mawozo goes directly to the issue of whether they knowingly engaged in interstate commerce with funds obtained from illegal gang activities.  The defendants' connection to 400 Mawozo underlies much, if not all, of the evidence at issue, and the Court finds that evidence of this connection is intrinsic to the overall case.  Indeed, absent some evidence connecting each defendant to 400 Mawozo, the government may not be able to sustain the conspiracy and money laundering (proceeds) charges as alleged in the indictment.

Alternatively, the Court would permit evidence of the defendants' gang association under Rule 404(b).  Rule 404(b) "is a rule of inclusion rather than exclusion," and only prohibits evidence "which lacks any purpose but proving character."  Bowie, 232 F.3d at 929–30.  Here, the evidence is not being used to prove the propensity of the defendants to commit gang-related crimes, but to show the defendants' motive, intent, and plan—their purpose in the gun smuggling effort—and  to complete the story of the overall conspiracy.

The probative value of the defendants' 400 Mawozo association is not "substantially outweighed" by the danger of unfair prejudice.  Rule 403 focuses on "the danger of unfair prejudice," and "does not bar powerful, or even prejudicia' evidence."  United States v. Pettiford, 517 F.3d 584, 590 (D.C. Cir. 2008) (cleaned up).  Defendants are charged with committing criminal acts to further the 400 Mawozo gang's illegal activities; direct evidence of their

association with that gang is central to the charges alleged in the indictment and does not unfairly prejudice them.   The Court will thus deny defendants' motion to suppress evidence of their connections to 400 Mawozo.

### B.  Evidence of Kidnappings

The government also maintains that evidence of 400 Mawozo's kidnappings is intrinsic to the conspiracy and money laundering (proceeds) charges.  Gov't Opp'n to MIL at 7–8.  The defense responds that the government must first make a threshold showing of evidence tying the ransom profits to the purchase of the firearms.  Rough Hr'g Tr. at 220:21–221:4.  The defense further objects to the admission of evidence relating to the October 2021 missionary kidnappings. The government concedes it cannot tie the purchase of the firearms to the missionary kidnappings, but argues that evidence of the defendants' knowledge of the gang's kidnappings is intrinsic to the money laundering charges and that the case is replete with references to defendants' involvement in the kidnappings—and specifically the kidnapping of the missionaries—in the communications between defendants.  Id. at 218:7–223:4.  Moreover, the government contends that the grand jury's indictment on the money laundering (proceeds) charges provides a threshold showing of evidence tying the firearm purchases to ransom profits.  Rough Hr'g Tr. at 227:13–227:21.

The Court agrees that some evidence of the 400 Mawozo gang's kidnappings is intrinsic to the charges.  The government must prove that defendants purchased the firearms with proceeds from 400 Mawozo's kidnappings.  Evidence that victims paid ransom money to 400 Mawozo to secure their release is necessary to prove the money laundering (proceeds) charges.  The government need not—as the defense contends—directly tie the money used to purchase the firearms to specific kidnappings; the government may meet its burden by connecting the purchases to 400 Mawozo's illegal activities, which includes kidnappings for ransom.  See United States v.

Braxtonbrown-Smith, 278 F.3d 1348, 1355 (D.C. Cir. 2002)  (government is not required under §

1956(a)(1) to "trace the origin of all funds deposited into a bank account to determine exactly

which funds were used for what transaction" (internal quotation marks omitted)); see also United

States v. Wynn, 61 F.3d 921, 922–26 (D.C. Cir. 1995) (upholding money laundering conviction

where the government presented sufficient evidence that the money "flow[ed] directly" from "a

large-scale, illegal narcotics trafficking operation," even if the defendant did not know "the precise

[illegal] activity").  Furthermore, evidence of 400 Mawozo's kidnappings goes to the heart of the

conspiracy, in which the government alleges defendants conspired to smuggle firearms specifically

to support these types of illicit activities.  And evidence of the defendants' communications

regarding the missionary kidnappings may be offered "as direct evidence" of the defendants'

involvement in 400 Mawozo's criminal activity.  See United States v. Mahdi, 598 F.3d 883, 891

(D.C. Cir. 2010) (internal quotation marks omitted).[6]

But the Court is mindful that defendants are not charged with kidnapping in this case and

that certain kidnapping evidence might be unfairly prejudicial under Rule 403.  The Court will

therefore be prepared to exclude evidence of the gang's kidnappings where its probative value is

substantially outweighed by the danger of unfair prejudice, particularly if the evidence presented

at trial is needlessly cumulative or "especially graphic in the context of the crimes" of which the

defendants are charged.  Cf. United States v. Lieu, 963 F.3d 122, 128 (D.C. Cir. 2020) (testimony

from a sexual abuse victim would not be "especially graphic in the context of the [charged]

crimes," relating to sexual misconduct).  Accordingly, the government is cautioned to limit the

quantity and nature of such evidence, although rulings on specific evidence will await trial and the

context presented.

---

[6] Alternatively, the Court would permit some evidence of 400 Mawozo's kidnappings under Rule 404(b)(2).

### C.  Evidence Regarding C.G. Call

The government seeks to introduce evidence of May 3, 2022 phone calls between Germine and a member of 400 Mawozo—known as "Gaspiyay"—to coordinate the release of kidnapping victim C.G.  404(b) Notice at 4–5.  The government argues that such evidence is admissible under Rule 404(b)(2) because it is probative of Germine's control over the 400 Mawozo gang and his knowledge of the gang's illicit activities.  Id. at 7–8.  The government believes such evidence will also preemptively rebut Germine's defense that he had no knowledge of the gang's kidnappings, which the government alleges provided the gang with funds used to purchase weapons in the United States.  Id. at 7.

Germine argues that "[w]hether [he] had control or not over 400 Mawozo's kidnappings has no bearing on the charges in this case."  Resp. in Opp'n to 404(b) Notice [ECF No. 89] ("Opp'n to 404(b)") at 3.  But Germine's control over the 400 Mawozo gang is relevant to his participation in the charged conspiracy to smuggle and export firearms from the United States to Haiti to support the gang's illegal activities, and to his intent—knowingly facilitating transactions in interstate commerce with proceeds from illegal activities—on the money laundering charges.  And this evidence is "particularly probative where the government has alleged conspiracy."  Mathis, 216 F.3d at 26 (quoting United States v. Sampol, 636 F.2d 621, 659 n.23 (D.C. Cir. 1980)).  It is thus admissible under 404(b)(2), subject to the Rule 403 balancing test.

The Court again notes that Rule 403 does not bar "powerful," or even "prejudicial," evidence, but rather "unfair[ly] prejudic[ial]" evidence.  Pettiford, 517 F.3d at 590.  The danger of unfair prejudice is of less concern here, where the government will introduce evidence of other 400 Mawozo illegal gang-related activities, including kidnappings.  See United States v. Straker, 800 F.3d 570, 591 (D.C. Cir. 2015) (per curiam) ("The danger of unfair prejudice was minimal

because the other-crimes evidence added no emotional or other pejorative emphasis not already introduced by the evidence of the crime charged in this case." (cleaned up)).  The small risk of unfair prejudice does not substantially outweigh the probative value of the evidence demonstrating Germine's control over 400 Mawozo and his knowledge of the gang's unlawful activities.

### IV.   Germine's Motion to Sever

Germine filed a motion to sever his trial from Tunis's, arguing that a joint trial violates his Sixth Amendment right to confrontation because the government seeks to introduce Tunis's statements to the FBI that implicate Germine as a leader of the conspiracy.  Reply to U.S. Omnibus Opp'n to Def.'s Mot. to Sever Defs. Pursuant to Bruton [ECF No. 96] at 1–2.  In Bruton v. United States, 391 U.S. 123 (1968), the Supreme Court held that a defendant is deprived of his right of confrontation when the prosecution introduces an incriminating confession of a non-testifying codefendant.  See id. at 123–24, 137.  In subsequent cases, the Court has clarified that while Bruton does not extend to confessions that do not name the defendant, Richardson v. Marsh, 481 U.S. 200, 211 (1987), it does extend to redacted confessions that "obviously refer" to the defendant, Gray v. Maryland, 523 U.S. 185, 186 (1998).  Thus, Bruton distinguishes between "confessions that directly implicate a defendant and those that do so indirectly."  Samia v. United States, 599 U.S. 635, 652 (2023).  Introduction of a statement does not violate Bruton where redactions in the statement contain "neutral references to some 'other person,'" that are not "akin to an obvious blank or the word 'deleted.'"  Id. at 653.

Germine objects to several portions of Tunis's statements where the government replaced his name with the words "someone else" or its equivalent.  See, e.g., Rough Hr'g Tr. at 177:23–178:3.  Germine seeks instead to either completely strike sentences that include references to him or replace his name with simply "[blank]."  See, e.g., id. at 185:10–185:21.  But the government

has properly redacted the statements in accordance with Bruton and Samia by substituting Germine's name with a neutral reference to another unnamed conspirator. Tunis's statements refer to several co-conspirators and the government intends to introduce the names of other 400 Mawozo members—some of whom, like Germine, live in Haiti. See id. at 230:20–230:24. The use of "someone else," particularly in a situation where the "someone else" might refer to any one of several individuals, does not violate Bruton. In fact, defendant's suggestion to replace his name with "[blank]" would likely present a bigger Bruton concern, as it would alert the jury to the possible redaction of a co-defendant's (i.e., Germine's) name. See Samia, 599 U.S. at 652 (favoring confessions with neutral references over confessions with obvious blanks). After close review, the Court is satisfied that the government's redactions sufficiently preserve Germine's Sixth Amendment right of confrontation.[7] Germine's motion to sever based on Bruton will therefore be denied.

## V.   Tunis's Motion to Sever

Tunis advances two arguments as to why the Court must sever the trials: (1) the redactions in Tunis's statements prejudice her right to include portions that are exculpatory or explanatory in nature, and (2) the admission of Germine's statements unfairly prejudice her.

### A.  Tunis Statements

Because joint trials promote efficiency, courts should only grant severance "if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." United States v. Williams, 507 F. Supp. 3d 181, 194 (D.D.C. 2020) (quoting Zafiro v. United States, 506 U.S. 534,

---

[7] In this opinion, the Court only addresses the admissibility of Germine's and Tunis's statements as they relate to the severance issue. The parties may object at trial to the admissibility of specific portions of the statements outside of the Bruton context.

539 (1993)).  As relevant here, such risk might arise if "essential exculpatory evidence that would be available to a defendant tried alone were unavailable in a joint trial."  Zafiro, 506 U.S. at 539.

At the outset, the Court notes an inherent tension in Tunis's motion: Tunis herself would not be able to admit all or part of her redacted statements into evidence.  Rather, the question here is whether once the government admits her redacted statements, do some of the redacted portions nonetheless also have to be admitted for exculpatory purposes or to provide necessary context?  Tunis argues that the portions of her statement that relate either to her cooperation with the government's kidnapping investigation or to her lack of knowledge of the kidnappings are exculpatory with respect to the allegation that she knew about, or was involved in, 400 Mawozo's illegal activities.[8]  Rough Hr'g Tr. at 206:21–207:9.  She also believes those portions are necessary to provide important context to her statements.

In United States v. Washington, 952 F.2d 1402 (D.C. Cir. 1991), co-defendant Washington argued that his testimony was improperly restricted because the court excluded exculpatory portions of his statement.  Id. at 1403.  The court found that Washington was not denied "a meaningful opportunity to present a complete defense" where the excluded information was not "substantially exculpatory."  Id. at 1404 & n.2 (internal quotation marks omitted).  The court further held that redactions of a confession "violate[] the rule of completeness only if the redacted version 'distorts the meaning of the statement or excludes information substantially exculpatory of the defendant.'"  Id. at 1404 (quoting United States v. Kaminski, 692 F.2d 505, 522 (8th Cir. 1982)).

---

[8] Tunis also objects to the redactions in Germine's statement that refer to threats that 400 Mawozo made against her and her family.  Tunis argues that if the government introduces Germine's statement, the government also needs to include those portions of the statement.  See Def. Eliande Tunis's Reply to Gov't Opp'n to Mot. to Sever Cases [ECF No. 94] at 2.  But because Germine's statement includes unredacted portions explaining that individuals work for 400 Mawozo under threats of violence towards them or their families, the Court is satisfied that the specific redactions do not prevent Tunis from pursuing this theory.

The redactions in Tunis's statements do not prevent her from presenting a complete defense in this case. None of the proposed redactions prevent a jury from understanding the unredacted portions, nor do they distort the statement's meaning. Further, while the redacted portions might help demonstrate Tunis's good character, they are not exculpatory as to the charges at issue, let alone "substantially exculpatory" so as to warrant severance.

Like Germine, Tunis also objects to the substitution of Germine's name with a neutral reference to "someone else" in her statements. In support of this objection, Tunis argues that the jury is entitled to know the name of the redacted co-defendant so that the jury can properly evaluate Tunis's role in the conspiracy. Rough Hr'g Tr. at 211:9–214:10. But Tunis has not offered any facts that situate this case differently from other cases dealing with <u>Bruton</u> issues. Without such unique facts, Tunis's argument goes too far: taken to its logical extent, redacting a co-defendant's name would not be permitted in any conspiracy case. The Court does not accept this position, which contravenes the long line of <u>Bruton</u> cases.

### B. Germine Statements

Tunis next argues that evidence of Germine's gang-related activities requires severance. Courts have required severance where there is "a great disparity in evidence," such that there is "a viable possibility that the jury, even with the aid of curative instructions and appropriate voir dire, will be unable to compartmentalize the evidence between defendants or will be impeded in their duty to render a fair assessment of guilt or innocence." <u>United States v. Gray</u>, 173 F. Supp. 2d 1, 15 (D.D.C. 2001); <u>see</u> <u>United States v. Mardian</u>, 546 F.2d 973, 977 (D.C. Cir. 1976) (severance is required "when the evidence against one or more defendants is 'far more damaging' than the evidence against the moving party"). In ruling on severance, courts consider the "weight of the

evidence," as well as "the quantity and type of evidence adduced against the co-defendants." Sampol, 636 F.2d at 646.

Here, Tunis has not demonstrated a "great disparity in evidence" between her and Germine. Indeed, there is no disparity at all in the direct evidence of involvement in the core gun smuggling charges. Although Germine may have played a greater role in 400 Mawozo than did Tunis, joinder of co-conspirator defendants is proper even where some defendants were less active than others. Gray, 173 F. Supp. 2d at 10–11; see United States v. Edelin, 118 F. Supp. 2d 36, 43 (D.D.C. 2000) ("[S]everance is not appropriate merely because some co-conspirators were more active in the conspiracy, nor because some co-conspirators played a more central role."). And evidence of Germine's 400 Mawozo activity will not impede the jury's ability to render a fair verdict against Tunis where the government intends to introduce evidence of Tunis's own connection to 400 Mawozo—including significant evidence from Tunis's cell phone records. Severance is thus not warranted on this basis either.

*      *      *

For the foregoing reasons, and upon consideration of the entire record herein, it is hereby

**ORDERED** that [83] Germine's motion to adopt [80] Tunis's motion in limine is **GRANTED**; it is further

**ORDERED** that [84] Tunis's motion to adopt [82] Germine's motion in limine is **GRANTED**; it is further

**ORDERED** that [102] Germine's motion to adopt [100] Tunis's reply to her motion in limine is **GRANTED**; it is further

**ORDERED** that [81] Germine's motion to suppress is **DENIED**; it is further

**ORDERED** that [78] Tunis's motion to suppress is **DENIED**; it is further

**ORDERED** that [80] defendants' joint motion in limine is **DENIED**; it is further

**ORDERED** that [82] defendants' joint motion in limine is **DENIED**; it is further

**ORDERED** that [76] the government's request to introduce 404(b) evidence is **GRANTED**; it is further

**ORDERED** that [86] Germine's motion to sever is **DENIED**; and it is further

**ORDERED** that [79] Tunis's motion to sever is **DENIED**.

**SO ORDERED**.


_____
                            /s/
                    JOHN D. BATES
              United States District Judge

Dated: January 2, 2024