**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| **v.** | : | |
| | : | **CASE NO. 21-CR-699-3 (JDB)** |
| **JOCELYN DOR,** | : | |
| | : | |
| **Defendant.** | : | |
| | : | |

## GOVERNMENT'S MEMORANDUM IN AID OF SENTENCING

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, now submits this sentencing memorandum for defendant Jocelyn Dor. The government requests that this Court sentence defendant Dor to 68 months' incarceration, 36 months' supervised release, and a special assessment of $600. The government recommends this sentence near the top of the advisory Guidelines' range of 57 - 71 months to reflect the gravity of Dor's conduct and his obstruction of the investigation after his criminal acts, but also taking into consideration his acceptance of responsibility and his role in the conspiracy to which he pled. As explained herein, the requested sentence would adequately serve the interests of justice as codified in 18 U.S.C. § 3553(a).

## PROCEDURAL HISTORY

On November 30, 2021, a grand jury indicted the defendant on one count of Conspiracy to Violate the Export Control Reform Act, in violation of 50 U.S.C. § 4819; fifteen counts of violating the Export Control Reform Act, in violation of 50 U.S.C. § 4819; three counts of Smuggling, in violation of 18 U.S.C. §§ 554(a), 2; and seven counts of Laundering of Monetary Instruments, in violation of 18 U.S.C. §§ 1956(a)(2)(A), 2.  On July 19, 2022, a grand jury returned a superseding indictment, adding six additional counts of Laundering of Monetary Instruments, in violation of 18

U.S.C. §§ 1956(a)(2)(A), 2.  On October 30, 2023, the defendant entered a guilty plea to Counts 1, 2, 7, 12, 24, and 27 of the Superseding Indictment.  The Court set sentencing for February 28, 2024.

## FACTUAL BACKGROUND

400 Mawozo is a Haitian gang and criminal organization that operated in and around the Croix-des-Bouquets area to the east of Port-au-Prince, Haiti. From at least on or about January 12, 2020, until the present, 400 Mawozo has been engaged in armed hostage takings of U.S. citizens in Haiti for ransom, including:

- Between on or about June 24, 2021, and on or about July 10, 2021, two U.S. citizens were taken hostage at gunpoint and held by 400 Mawozo, and their release was secured after approximately $25,000 was paid as ransom.

- Between on or about August 5, 2021, and on or about August 13, 2021, a U.S. citizen was taken hostage at gunpoint and held by 400 Mawozo, and her release secured after approximately $50,000 was paid as ransom.

- Further, on or about October 16, 2021, seventeen Christian missionaries, sixteen of whom were citizens of the United States, were taken hostage near Port-au-Prince, Haiti, including five children, one as young as eight months old ("the Hostages").

Beginning on or about October 18, 2021, the 400 Mawozo gang began taking credit for the hostage takings on social media and making publicly known the aforementioned ransom demand. Specifically, on or about October 21, 2021, a leader of 400 Mawozo appeared in a social media video and announced that the gang was holding the Hostages for ransom.

The defendant, Jocelyn Dor, is a Haitian citizen who resided in Florida. Beginning at least on or about September 12, 2021, and continuing until on or about November 8, 2021, the defendant conspired with leaders of 400 Mawozo, namely his co-defendant Joly Germine, to export and smuggle firearms from the United States to Haiti without having first obtained the required licenses

2

from the U.S. Department of Commerce's Bureau of Industry and Security ("BIS"). In addition, the defendant conspired with his co-defendant Eliande Tunis to defraud the United States by interfering with and obstructing a lawful government function, that is, the enforcement by ATF of laws and regulations related to the purchase and sale of firearms, by means of deceit, craft, trickery, and dishonesty. Finally, the defendant received funds from individuals linked to 400 Mawozo in Haiti for the specific purpose of purchasing firearms in the United States to send to the gang. The evidence shows the following:

### *Communications about and Purchases of Firearms*

On September 17, 2021, co-defendant Joly Germine sent a series of text messages to Tunis including a photograph of the defendant's Florida concealed weapons permit and a cell phone contact card for the defendant. Sentencing Exhibit 1.



***Sentencing Exhibit 1A and B***

On September 28, 2021, Tunis exchanged a series of WhatsApp text and audio messages with the defendant. The defendant sent a photo of a rifle and a box of 15 7,62 x 39 mm cartridges. Tunis responded, "ask him how much." Sentencing Exhibit 2. Tunis also asked the defendant if he

3

stopped by "other places" to check for ammo. The defendant responded that he did stop by some

additional places but did not find what he was looking for. Sentencing Exhibit 3.



*Sentencing Exhibit 2A and B*

On September 28, 2021, the defendant bought a Century Arms VSKA AK-47 style rifle from

Rieg's Gun Shop in Orlando, Florida. He also bought two boxes of 7,62 x 39mm caliber bullets. On

September 29, 2021, the defendant bought another Century Arms VSKA AK-47 style rifle from The

Shooting Gallery Range in Orlando, Florida. He also purchased 40 rounds of 7,62 caliber bullets at

The Shooting Gallery Range. On both dates, the defendant falsely filled out the ATF Form 4473,

certifying that he was the "actual transferee/buyer" of the firearms in question by checking "yes" to

question 21(a) on the form. At the top of ATF Form 4473 is the word "WARNING" in all caps and

bolded, followed by several warnings and including that "[a]ny person who exports a firearm without

proper authorization from either the Department of Commerce or the Department of State, as

applicable, is subject to a fine of not more than $1,000,000 and up to 20 years imprisonment."

On October 1, 2021, Tunis forwarded the defendant two images of rifle magazines on

WhatsApp. The defendant responded by sending back two photos of rifle magazines, seemingly in

his own hands while in a store. Sentencing Exhibit 4 A-D.



*Sentencing Exhibit 4A and B*

*Sentencing Exhibit 4C and D*

That same day, the defendant purchased two Century Arms VSKA AK-47 style rifles from Shooter's World in Orlando, Florida. Once again, the defendant falsely filled out the ATF Form 4473, certifying that he was the actual transferee/buyer of the firearms in question by checking "yes" to question 21 on the form. While at Shooter's World, the defendant also took a picture of a Barret 82Al .50 caliber rifle assembled in the store and sent it to Tunis via WhatsApp. Sentencing Exhibit 5.



***Sentencing Exhibit 5***

On October 4, 2021, the defendant sent two videos to Tunis on WhatsApp. The first video appears to have been shot by the defendant in a store, showing the .50 caliber rifle on display, previously sent in the above image on October 1. Sentencing Exhibit 6A. The second video is from YouTube, in which an individual shows the power of a .50 caliber rifle against bulletproof glass. Sentencing Exhibit 6B. Approximately an hour later, Germine had an 86-minute call with Tunis during which Germine also placed a three-way call to the defendant, who was on the call for 46 minutes.



***Sentencing Exhibit 6B***

On October 5, 2021, the defendant sent Tunis three images over WhatsApp of different

firearms. At the same time, the defendant sent Tunis a voice memo, stating: "Here it is, baby girl! Here's the beast…These are the ones that I've purchased the most…I bought it for 1,500. The other one, the on below, they made me pay 2,000 for it…." Sentencing Exhibit 7.



*Sentencing Exhibits 7A-C*

After sending the third image above, the defendant sent another voice memo to Tunis explaining that if he were to send "him"—implying co-defendant Germine—the photo of the final weapon "his dick would instantly get hard…I know if he saw it….he would get excited, excited about it." Sentencing Exhibit 7T.

 That same day, Tunis forwarded the defendant two images of bullets on WhatsApp. Sentencing Exhibit 8A-B. The defendant sent a subsequent voice memo to Tunis on WhatsApp, in which the defendant explained that the firearm comes with only one magazine and he would have to order the other magazine. Sentencing Exhibit 8T.



*Sentencing Exhibits 8A and B*

On October 5, 2021, the defendant purchased a Riley Defense RAK-47 rifle and one Century Arms VSKA AK-47 style rifle from Shoot Straight in Orlando, Florida. On October 6, 2021, the defendant finalized the purchase of the Barrett 82A1 .50 caliber rifle (about which he has corresponded with Tunis, as described above) and a Springfield Armory M1A from Shooter's World in Orlando, Florida. On both dates, the again defendant falsely filled out the ATF Form 4473, certifying that he was the "actual transferee/buyer" of the firearms in question by checking "yes" to question 21(a) on the form.

On October 17, 2021, Tunis had a 102-minute phone call with the defendant, during which she also placed a three-way call to Germine, who was on the call for 15 minutes and then for another 54 minutes. That same day, the defendant purchased two more Century Arms VSKA AK-47 style rifles at Shoot Straight in Orlando, Florida. Once again, the defendant indicated he was the actual transferee/buyer of the firearm by checking "yes" to question 21 on the ATF Form 4473.

All told, the defendant purchased ten semi-automatic firearms between September 28, 2021, and October 17, 2021, at the direction of Joly Germine for the express purpose of shipping those weapons to 400 Mawozo gang leaders in Haiti. All of these weapons were recovered by the FBI in November 2021. Sentencing Exhibit 9.



*Sentencing Exhibit 9*

*Movement of Money for the Purchase of Weapons*

Throughout this scheme, the defendant received money from the gang in Haiti for these purchases. On September 28, 2021, co-defendant Germine called Santia Jean, an individual in Haiti who acted as the bookkeeper for Germine and 400 Mawozo.  Jean thereafter wired $2,000 to the defendant using MoneyGram and $2,000 using Western Union. On September 29, 2021, Jean called both Tunis and Germine. Then, Jean wired $2,000 to the defendant using MoneyGram and $2,500 using Western Union. These payments occurred on the same dates that the defendant made the purchases noted above at Rieg's Gun Shop and The Shooting Gallery Range.

On October 4, 2021, Tunis sent the defendant an image over WhatsApp of the screenshot of a branch of the Fifth Third bank in Boca Raton, Florida, asking, "Babe this is it right." Sentencing Exhibit 10A. The defendant responded with a voice memo, stating that was it. Sentencing Exhibit 10. On or about October 4, 2021, Tunis sent $1,000 to the defendant in two payments via Zelle.

On October 5, 2021, Tunis sent the defendant a voice memo saying that "By 2:30 I will

deposit it for you, darling." Sentencing Exhibit 11T. The defendant responded by sending an image of an account number and routing number. Sentencing Exhibit 11B. Tunis then withdrew $15,000 in cash from a bank account registered in her name and deposited the same amount into an account registered to the defendant at the Fifth Third bank. Tunis sent an image of the bank receipt to the defendant over WhatsApp confirming the transfer. Sentencing Exhibit 11E.

### *Knowledge of the Illegal Scheme and Steps to Conceal It*

While making all of these purchases, filling out all of these forms, and receiving all of these money transfers, the defendant knew that these weapons were being purchased for someone else and that he needed to make efforts to conceal that fact. For example, on October 5, 2021, Tunis sent the defendant a forwarded image of someone holding a rifle, and the text instructions "they will tell you which bullet." Sentencing Exhibit 12. The defendant responded by WhatsApp voice memo: "No, I don't think they will understand it this way… They know I live here. They think it's ugly, they might think that this is not for here." Sentencing Exhibit 12T.

Later that same day, Tunis sent a WhatsApp message stating "make them take them apart for you, my baby" and then asked the defendant to call her. Sentencing Exhibit 13. The defendant replied with a voice memo saying: "text me instead, darling. He keeps asking me if I'm buying them for someone else. I can see that…he'll be suspicious when I am on the phone…" Sentencing Exhibit 13. That evening, the defendant sent another voice memo to Tunis, explaining how the person in the gun store was asking him questions about who he worked for, if his wife knew that he was buying these weapons and who he was buying them for. Sentencing Exhibit 14. The defendant stated he explained to the store employee "no one [sic] buys weapons for people here, you buy your stuff for yourself…" Sentencing Exhibit 14.

Additionally, the defendant knew that these weapons were destined to leave the country and needed to be smuggled out in order to accomplish this. On October 5, 2021, the defendant described

in a voice memo to Tunis other weapons at the store that he could purchase for her: one that is "piece by piece" and one that is "fully assembled," and that both types will be shipped inside boxes, and even if he bought the box "it'd be able to go in a drum." Sentencing Exhibit 15. On October 17, 2021, the defendant sent Tunis a photograph of a long rectangular box, fully taped and ready for shipment. Sentencing Exhibit 16.  On October 18, 2021, the defendant sent Tunis a voice memo, in which he stated: "No, there is no chance it does not get there, darling. . . I've already told you; the way I did it, the way I taped it, the person cannot open it. She/he cannot open it because if she/he opens it, you'll know." Sentencing Exhibit 17.



***Sentencing Exhibit 16***

Once the FBI discovered the scheme, the defendant took efforts to conceal his involvement in the conspiracy. On October 26, 2021, Tunis sent a voice memo to the defendant, telling him that things were complicated, that when she returned from Haiti yesterday "three men from F" came onto the plane and got her, and that they have to talk. Sentencing Exhibit 18. After that, the defendant began the process of retrieving the firearms he had purchased for the conspiracy. On October 28, 2021, the defendant reached out to co-defendant Walder St. Louis, asking him "how long before you arrive?" and to "call me before you leave." Sentencing Exhibit 19. On October 29, 2021, the defendant placed eight WhatsApp calls to Flor Tunis, the sister of co-defendant

Tunis who was holding the firearms retrieved from the shipper. Sentencing Exhibit 20.

The FBI attempted to arrest the defendant on October 31, 2021, but was unable to locate either the defendant or the numerous high-powered rifles that FBI knew he had purchased. After making an attempt to arrest the defendant at his home, the FBI and U.S. Marshal Service expended effort to track the defendant's whereabouts, at one point nearly arresting him at a trucker rest stop in the Midwest. The defendant by that point had ceased using his cell phones, showing that he was aware that law enforcement was looking for him. The defendant called his employer (a trucking company) and reported that he had to go back to Haiti for a family emergency. The defendant's conduct created serious concerns for law enforcement and law enforcement expended numerous resources to locate him, given that he was believed to be heavily armed and his whereabout were unknown.

On November 5, 2021, the defendant rented a storage unit at AAA Key Storage in Orlando, Florida, where the FBI ultimately recovered the ten firearms he purchased in furtherance of the conspiracy. Sentencing Exhibit 21. On November 8, 2021, the defendant through counsel contacted the government to turn himself in. His attorney provided the FBI with the defendant's cellular phone, and, pursuant to a proffer letter, the information to a storage unit.[1]

When the FBI conducted a review of the Samsung Galaxy Z Fold2 phone obtained through the defendant's attorney, they found the phone had its first instance of non-system data on November 10, 2021, likely because it had been factory reset. The Cellebrite extraction of the phone revealed the same. For instance, the phone only noted five "device events" (powering on of the device) after November 4, 2021, and the phone previously had 99 contacts, all of which had been deleted but were restored from the Cellebrite extraction. Sentencing Exhibit 22. This would be an abnormally low

---

[1] Investigators later discovered a charge for the storage unit on the defendant's monthly credit card statement.

number of device events and contacts for a phone that was in regular use. The defendant was arrested on November 8, 2021.

## SENTENCING CALCULATION

### A.  STATUTORY MAXIMUMS

A violation of 50 U.S.C § 4819 carries a maximum sentence of 20 years; a fine of not more than $1,000,000 or twice the pecuniary gain or loss of the offense, pursuant to 18 U.S.C. § 3571(b); and a term of supervised release of not more than 3 years, pursuant to 18 U.S.C. § 3583(b)(2). A violation of 18 U.S.C. § 1956(a) carries a maximum sentence of 20 years imprisonment, a fine of not more than $1,000,000 or twice the pecuniary gain or loss of the offense, pursuant to 18 U.S.C. § 3571(b); and a term of supervised release of not more than 3 years, pursuant to 18 U.S.C. § 3583(b)(2). A violation of 18 U.S.C. § 371 carries a maximum sentence of 5 years of imprisonment; a fine of $250,000, pursuant to 18 U.S.C. § 3571(b)(3); and a term of supervised release of not more than three years, pursuant to 18 U.S.C. § 3583(b)(2).

### B.  SENTENCING GUIDELINE CALCULATION

The plea agreement conveys the parties' estimation that the offenses of conviction carry either a base offense level of 26 or 28, as follows:

Count One, Conspiracy, is guided by U.S.S.G. § 2X1.1(a), which directs the Court to apply the base offense level from the guideline for the substantive offense. In this case, the substantive offense is charged in Counts Two, Seven, and Twelve, violations of the Export Control Reform Act. Those counts are guided by U.S.S.G. § 2M5.2, for which the base offense level is 26. The plea agreement left the parties open to argue whether an enhancement should be applied under U.S.S.G. § 3C1.1 for Obstruction. If applied, two points are added, bringing the base offense level to 28.

Counts Twenty-Four and Twenty-Seven are guided by U.S.S.G. § 2S1.1. The base offense level of these counts of conviction, pursuant to § 2S1.1(a)(2), is 8. The value of the laundered funds

adds 6 points pursuant to U.S.S.G. § 2B1.1; because the offense involved firearms and national security, 6 points are added pursuant to U.S.S.G. § 2S1.1(b)(1)(iii); and because the defendant was convicted under 18 U.S.C. § 1956, two additional points are added. Therefore, the total base offense level for those counts is 22.

The parties disagree with the presentence report writer on the calculations for Counts Twenty-Four and Twenty-Seven, which the government noted in a call with the Probation office after reviewing the initial draft report. While the plea agreement does not specify which section of § 2S1.1(a) should apply, the parties agree that the appropriate guideline is U.S.S.G. § 2S1.1(a)(2). In order for U.S.S.G. § 2S1.1(a)(1) to apply, it must be possible to determine the offense level "for the underlying offense from which the laundered funds were *derived*" (emphasis added). U.S.S.G. § 2S1.1(a)(2) must apply to any other conviction for a money laundering offense. This phrase in § 2S1.1(a)(1) incorporates an inherent distinction between transactions where proceeds were *derived* from criminal activity, and transactions in which funds obtained from any source were designed to *promote* criminal activity. The government made this argument at sentencing in *United States v. Mehmet Hakan Atilla*, 15-cr-867-5 (RMB), ECF No. 505 (S.D.N.Y 2018) as follows:

> "Two provisions of the money laundering statute, 18 U.S.C. §§ 1956(a)(1) and 1956(a)(2)(B), criminalize certain transactions in the proceeds of specified unlawful activity. The statute further defines 'proceeds' as 'property derived from or obtained or retained, directly or indirectly, through some form of unlawful activity.' 18 U.S.C. § 1956(c)(9). Section 2S1.1(a)(1) carefully tracks this language, making clear that it applies only to offenses involving the proceeds of specified unlawful activity. By contrast, the offense charged in Count Six of the Indictment charges only a conspiracy to commit money laundering in violation of § 1956(a)(2)(A)—a separate section that makes no reference to 'proceeds' or to funds 'derived from' criminal activity."

*Atilla,* ECF No. 505, at 32. As in *Atilla*, the defendant was not convicted of laundering money that was "derived from" any other offense.[2] Rather, he was convicted of 18 U.S.C. § 1956(a)(2)(A): laundering money with the purpose of promoting a specified unlawful activity—the smuggling of firearms in violation of the Export Control Reform Act. There is no underlying offense alleged in Counts Twenty-Four and Twenty-Seven from which those funds were derived; only those offenses which the funds promoted are alleged in the indictment and outlined in the defendant's statement of offense. See ECF No. 34 and 66. Accordingly, § 2S1.1(a)(2) must apply, because no underlying offense from which the funds are derived can be determined where none is alleged.

Counts Two, Seven and Twelve are the objects of the conspiracy in Count One. Each of the substantive counts involves the same victim, the United States government. Therefore, they each group with Count One pursuant to U.S.S.G. § 3D1.2(b), application note 8. Counts Twenty-Four and Twenty-Seven can be grouped together, pursuant to U.S.S.G. § 3D1.2(d), because their offense levels are determined "largely on the basis of the total amount of harm or loss," namely the amount of the laundered funds. Counts Twenty-Four and Twenty-Seven can further be grouped with the additional counts pursuant to U.S.S.G. § 3D1.2(c), application note 6.

The parties agree that, pursuant to pursuant to U.S.S.G. § 3E1.1, a reduction of a total of three levels is appropriate due to the defendant's acceptance of responsibility and his early interest and subsequent acceptance of a plea which allowed the government to avert preparations for trial and the Court to efficiently allocate resources.

---

[2] The defendant differs from his co-defendants Tunis and Germine, who have been convicted of counts charging both 18 U.S.C. § 1956(a)(2)(A) and 18 U.S.C. § 1956(a)(1)(A)(i). See, ECF No. 125 and 155 for comparison.

Because the defendant has no prior criminal history, the parties therefore estimated the applicable Sentencing Guidelines range to be either 46 to 57 months (without obstruction) or 57 to 71 months (with obstruction) of incarceration and a fine of between $20,000 and $200,000.

## SENTENCING RECOMMENDATION

A district court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall,* 552 U.S. 38, 49 (2007). The Guidelines are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions" and are the "starting point and the initial benchmark." *Id.* at 46-49. The district court should next consider all of the applicable factors set forth in 18 U.S.C. § 3553(a). *Id.* at 49-50. Indeed, the Guidelines themselves are designed to calculate sentences in a way that implements the considerations relevant to sentencing as articulated in § 3553(a). *United States v. Rita*, 551 U.S. 338, 347-50 (2007).

The § 3553(a) factors include (1) "the nature and circumstances of the offense and the history and characteristics of the defendant"; (2) the need for the sentence imposed to reflect the seriousness of the offense, to provide just punishment for the offense, to afford adequate deterrence to criminal conduct, to protect the public from further crimes of the defendant, and to provide the defendant with needed correctional treatment; (3) the Sentencing Guidelines and related Sentencing Commission policy statements; and (4) the need to avoid unwarranted sentence disparities.

### A. AN ANALYSIS OF 18 U.S.C. § 3553(a) FACTORS DEMONSTRATES THAT A SENTENCE OF 68 MONTHS IN PRISON FOR THE DEFENDANT IS APPROPRIATE.

The United States recommends that the defendant be sentenced to a period of 68 months' incarceration, which is near the high end of the Sentencing Guidelines range for this defendant. A guidelines-compliant sentence is appropriate where, as here, no downward departure is warranted

under the Sentencing Guidelines, and an analysis of the § 3553(a) factors reveals no reason to vary from the carefully constructed and longstanding Guidelines.

### 1.  The Nature and Circumstances of the Offense

The nature and circumstances of the offense are serious.  The Export Control Reform Act of 2018 allows the Department of Commerce to prohibit certain items to be exported from the United States to foreign countries without a license through the Export Administration Regulations ("EAR"). In particular, the EAR restrict the export of items that could make a significant contribution to the military potential of other nations or that could be detrimental to the foreign policy or national security of the United States. The items the defendant purchased for export—firearms and ammunition—are among the most sensitive items subject to the EAR controls. Among other reasons, firearms are controlled for national security, regional stability and anti-terrorism reasons. In other words, violating the export control laws constitutes a serious criminal offense because those laws help protect the national security and economy of this country, and impact our foreign policy with other nations—in particular the important U.S. interest in ensuring the stability of Haiti. Finally, at the trial of the defendant's co-defendant Joly Germine, Senior Special Agent Jaime Morales of the Bureau of Alcohol, Tobacco, Firearms and Explosives provided expert testimony that the firearms defendant Dor purchased were intended for combat and, notably, that the Barrett .50 caliber rifle is a firearm used by militaries against equipment. *See, e.g.* Trial Tr. 01/23/2024 676:3 – 677:9 (description of VSKA AK-47 variant with holographic scope as "very helpful in combat"); Tr. 689:6 – 690:8 (describing the Barrett .50 caliber rifle as used by the U.S. military against equipment and accepts a bullet which is half an inch in diameter).

The U.S. Sentencing Commission has recognized the seriousness of violations which threaten security or foreign policy interests of the United States. *See* §2M5.2, Application Note 2.  Here, the defendant not only committed export violations that threatened the security and policy interests of

the United States, but he did so with ten separate transactions for firearms, and through a sophisticated smuggling scheme put in place by co-defendants across two countries. And the defendant was part of a conspiracy whose members exported or attempted to export at least 24 firearms from the United States to Haiti, along with hundreds of rounds of ammunition. While the government is not seeking an upward departure from the Guidelines, as contemplated for "extreme" cases under Application Note 2, the volume, sophistication and security implications here support the government's request for a top-of-guidelines sentence. By imposing a sentence in this range, the Court would send a message that the United States takes these violations seriously and provides healthy and appropriate deterrence to would-be violators.

### 2. The History and Characteristics of the Offender

The defendant appears to be a hard-working and intelligent person who has his commercial driver's license and has worked recently as a truck driver and a construction laborer.  He is capable of making a living through non-criminal means.  He has no known criminal convictions.

The defendant may be deported.  The PSR references the possibility of a departure under *United States v. Smith*, 27 F.3d 649.  PSR ¶ 168. The government does not believe a *Smith* departure is warranted in this case.

In *Smith*, the D.C. Circuit

> allowed downward departure because of a defendant's status as a deportable alien, recognizing that because such aliens were ineligible for spending the last 10% of their sentences in community-based confinement and could not be assigned to minimum security prisons a defendant's deportable alien status would 'substantial[ly] ... affect the severity of his confinement.'

*United States v. Graham*, 83 F.3d 1466, 1481 (D.C. Cir. 1996) (quoting *Smith*, 27 F.3d at 655; other citation to *Smith* omitted).

The *Smith* Court provided this guidance to district courts considering whether a departure based on a defendant's deportable alien status is appropriate:

> Further, we do not mean to suggest that a departure is in order whenever a factor unrelated to a prisoner's just deserts may affect the severity of his confinement. For a departure on such a basis to be reasonable the difference in severity must be substantial and the sentencing court must have a high degree of confidence that it will in fact apply for a substantial portion of the defendant's sentence. Finally, as the defendant's status as a deportable alien is by no means necessarily unrelated to his just deserts [sic], even a court confident that the status will lead to worse conditions should depart only when persuaded that the greater severity is undeserved. Thus the court will fulfil the Guidelines' command that such departures will be "highly infrequent."

*Smith*, 27 F.3d at 655 (quoting U.S.S.G., Ch. 1, Pt. A, § 4(b)).

Given the serious nature of the defendant's conduct, as described above, the government submits that the limited increase in severity of the defendant's sentence—at most an additional 7 months (10% of 68 months) if good time credits are unavailable due to the defendant's immigration status—are not undeserved. Accordingly, a *Smith* departure is not appropriate.

### 3. The Need to Promote Respect for the Law, to Provide Just Punishment, to Afford Adequate Deterrence, and to Protect the Public.

Deterrence and promoting respect for the law should be the principal goals of the Court's sentences in this case. In order to promote respect for the law, it is necessary and appropriate to impose a meaningful sentence. Defendant's multiple purchases of firearms that were intended to be smuggled to a Haitian gang shows complete disregard for U.S. law and security, illustrating why a sentence of 68 months is appropriate. A sentence that is too lenient would convey the wrong message and could convince others that doing illegal business with gangs is worth the risk of getting caught by U.S. law enforcement and facing a relatively minor penalty. Rather, the Court should send the message that violating U.S. law comes with serious consequences so that future would-be violators will be adequately deterred.

### 4. The Need to Avoid Unwarranted Sentencing Disparities Among Defendants with Similar Records Who Have Been Found Guilty of Similar Conduct

The starting point in the Court's analysis under § 3553(a)(6) should be to consider the sentences of "defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6). The defendant's closest comparators are his co-defendants, all of whom have yet to be sentenced. However, as the government has noted in two filings regarding defendant Tunis's and defendant Germine's guidelines ranges, *see* ECF Nos. 125 and 155, his co-defendants who held positions of authority in the conspiracy, and knew where that the funds laundered to the United States came from gang activity, will face a significantly higher sentencing recommendation from the government. On the other hand, this defendant bought ten guns in less than one month's time, received multiple transfers of thousands of U.S. dollars from co-conspirators, and he has made no statements disowning his conduct or support for the gang. His conduct is worthy of a higher sentence than other co-conspirators who do not have these confounding factors.

The limited number of comparable gun-smuggling sentences imposed in other cases reinforces that a sentence of 68 months for defendant Dor is appropriate. The *Tita* case in the District of Maryland is illustrative. In *Tita*, three co-defendants were convicted at trial of conspiracy in violation of 18 U.S.C. § 371, transporting firearms with obliterated serial numbers in violation of 18 U.S.C. § 922(k), and smuggling firearms and ammunition from the United States to Nigeria in violation of 18 U.S.C. § 554(a). *See United States v. Tita, et al.*, Case No. 21-cr-334 (D. Md.). The defendants were acquitted of charges under the Arms Export Control Act and the Export Control Reform Act. The court sentenced each of the three co-conspirators to 63 months imprisonment and two years of supervised release. *See* ECF Nos. 184 (Judgment as to Eric Fru Nji); 201 (Judgment as to Wilson Nuyila Tita); and 221 (Judgment as to Wilson Che Fonguh). There is no indication that

these defendants were involved in smuggling firearms to a gang which subsequently took 16 U.S. citizens hostage, as is the case here.

The government has also considered the defendant's limited cooperation at the beginning of the case—providing the location of the firearms and turning over his cell phone through his attorney—and recommends a sentence that takes his actions into cooperation. Despite that fact, the defendant caused a serious expenditure of resources related to his arrest, as well as a considerable safety risk once the FBI knew he had as many as 10 high-powered rifles with him, but he could not be located for several days.

For his level of involvement in the conspiracy, plus the volume of guns and ammunition he purchased and for whom, this defendant deserves a guidelines sentence on the high end of the guidelines range.

## CONCLUSION

Wherefore, the government recommends a sentence of incarceration at the high end of the defendant's guidelines range, specifically 68 months of incarceration, 36 months of supervised release, and a $600 special assessment.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY

By: /s/ *Kimberly L. Paschall*
     Kimberly L. Paschall (D.C. Bar No. 1015665)
     Karen P. W. Seifert (N.Y. Bar No. 4742342)
     Assistant United States Attorneys

MATTHEW G. OLSEN
ASSISTANT ATTORNEY GENERAL

Beau D. Barnes (D.C. Bar No. 1024150)
Trial Attorney
Counterintelligence and Export Control
Section
National Security Division
U.S. Department of Justice